UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

METRO FUNDING CORP., SATORI
OPPORTUNITY DEBT FUND LP and C.S.
CHARITABLE TRUST,

                               Plaintiffs,

                -against-

WESTLB AG,

                             Defendant.

———————————————————————— x

10 Civ. 1382 (CM)

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3|19|10

### DECISION AND ORDER DENYNG PLAINTIFFS' APPLICATIONS FOR PRELIMINARY INJUNCTIVE RELIEF

McMahon, J.:

## **INTRODUCTION**

Plaintiffs Metro Funding Corp. ("Metro"), Satori Opportunity Debt Fund LP ("Satori") and C.S. Charitable Trust (the "Charitable Trust") (collectively, "Plaintiffs") bring this contract-based action against defendant WestLB AG ("WestLB" or "Defendant"). The dispute arises out of two contracts: a Credit and Security Agreement between WestLB and non-parties MFC Funding LLC ("MFC") and Wells Fargo Bank, N.A. ("Wells Fargo") (the "Credit Agreement"), and a Servicing Agreement between WestLB, Metro, MFC and Wells Fargo (the "Servicing Agreement"). Plaintiffs' Complaint asserts five causes of action: breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement, impairment of security and tortious interference with contract.

Pending before the Court are Plaintiffs' two applications for preliminary injunctions. Plaintiffs seek to enjoin WestLB from (1) preventing Metro from being reimbursed for fees and

expenses incurred by Metro in servicing mortgaged properties that secure WestLB's loan to MFC; (2) terminating Metro as the Servicer; and (3) demanding immediate repayment of WestLB's $44.8 million loan to MFC under the Credit Agreement.

For the reasons set forth below, the Court denies Plaintiffs' applications for preliminary injunctive relief in their entirety.

## BACKGROUND

### I.     Facts

The relevant facts are taken from the affidavits submitted in connection with Plaintiffs' applications and from the testimony and other evidence presented at the hearing held before the Court on March 10, 2010.

#### A.     The Parties

##### 1.     Metro

Plaintiff Metro, a New Jersey corporation founded in 2004, is a private commercial real estate lending company that specializes in short-term, asset-backed opportunity loans. (Decl. of David Hecht, Feb. 19,2010 ("2/19 Hecht Decl."), ¶¶ 5, 10.)  Metro originates bridge loans typically ranging in size from $500,000 to $7 million, with terms ranging from one to three years. (Id. ¶¶ 6, 8.)  The loans are secured by commercial real estate (both business and residential). (Id. ¶ 8.)

David Hecht is Metro's President and CEO. (Id.¶ 11.)  Hecht avers that he is "personally involved with every Metro loan." (Id.)

### 2.   Satori

Plaintiff Satori is a Delaware limited partnership.  (Compl. ¶ 5.)  As a "Senior Participant" in the loan transaction at issue, Satori has contributed over $1.4 million to fund loans originated by Metro.  (ld.)

### 3.   The Charitable Trust

Plaintiff the Charitable Trust is a New York trust.  (Compl. ¶ 6.)  The Charitable Trust, like Satori, is a Senior Participant, and has contributed approximately $875.000 to fund loans originated by Metro.  (Decl. of Haim Victor Cohen Saban, Mar. 8, 2010 ("Saban Decl."), ¶ 6.)

### 4.   WestLB

Defendant WestLB is a German bank.  (See Compl. ¶ 7.)  Jon A. Hellbusch ("Hellbusch") is an Executive Director in the Corporate and Structured Finance Products Group in WestLB's New York Branch.  (Decl. of Jon A. Hellbusch, Mar. 4, 2010 ("Hellbusch Decl."), ¶ 1 .  Hellbusch is the WestLB officer principally responsible for the transaction at issue.)(

## B.   The Transaction

In 2006, Metro engaged broker FalconBridge Capital Markets, LLC ("FalconBridge") to find a source of institutional financing for loans that Metro originated.  (2119 Hecht Decl. ¶¶ 19-20.)  In mid-2006, FalconBridge introduced Metro to WestLB, and the process of negotiating a funding facility began.  (ld. ¶ 21; Hellbusch Decl. ¶ 9.)

On or about February 28, 2007, Metro, WestLB and MFC, a special purpose entity created for the transaction, along with Wells Fargo and Valley National Bank ("Valley National"), entered into a series of contracts (the "Transaction Documents," discussed below).  (See 2119 Hecht Decl. ¶ 26; Hellbusch Decl. ¶ 13.)  The basic structure of the deal was as follows: WestLB would provide MFC with a $50 million revolving credit facility (the "Credit

Facility"), which MFC would use to purchase mortgage loans that had been originated by Metro. (Hellbusch Decl. ¶¶ 9-11.) The loans serve as collateral for WestLB's advances to MFC. (Id. ¶ 9) Metro, as the Servicer under the Servicing Agreement, agreed to service the loans. (Id.) The term of the Credit Facility is three years from the termination of the revolving period, and is set to expire in February 2013. (2119 Hecht Decl. ¶ 30.)

In accordance with the Transaction Documents, the underlying mortgagors make payments to Metro pursuant to a loan schedule. (Id. ¶ 29.) Those payments are deposited in a "Lockbox Account," and are almost immediately transferred to a "Collection Account" administered by Wells Fargo, the Custodian. (Id.) Funds are then disbursed from the Collection Account to the various parties in order of priority as specified in the Credit Agreement. (Id.) For example, WestLB is entitled to a certain share of each monthly payment, and Metro receives a "Servicing Fee." (Id. ¶ 38.) Funds cannot be disbursed to Metro from the Collection Account if WestLB does not consent to the disbursement. (See Prelim. Inj. Hr'g Tr., Mar. 10, 2010 ("3/10 Tr."), at 28:13-21.)

C.    **The Contracts**

The Credit Agreement and the Servicing Agreement are the two Transaction Documents critical to this case. (See 2/19 Hecht Decl. Exs. B-c.)¹ Both contracts were drafted by WestLB's deal counsel, DLA Piper, with some back and forth between the parties. (See Reply Decl. of David Hecht, Mar. 8, 2010 ("Hecht Reply Decl."), ¶ 2; 3110 Tr. 4:11-18.) The Credit Agreement and the Servicing Agreement were executed on February 28, 2007, and later amended on July 1, 2008. (2119 Hecht Decl. ¶ 27.) The parties agree that the July 1, 2008 versions of the contracts govern. (See id. Exs. B-C; Def.'s Mem. of Law, Mar. 4, 2010 ("Def.'s

---

¹ Exhibit C to the 2119 Hecht Declaration also contains a "Service Agreement," which is irrelevant and not part of the Servicing Agreement. Citations to Exhibit C refer only to the Servicing Agreement, not the Service Agreement.

Opp."), at 1.)  All parties to the Transaction Documents were represented by counsel in connection with their negotiation and execution.  (Hellbusch Decl. ¶ 10.)  Plaintiffs Satori and the Charitable Trust are not parties to any of the Transaction Documents.

A third relevant document is Metro's internal Underwriting and Collection Practices (the "Collection Policy").  (See 2l19 Hecht Decl. Ex. A.)  The Collection Policy was annexed as Exhibit B to the Servicing Agreement.  It was not, however, created or negotiated specifically for this deal or by the parties to the deal.

### 1.     Overview of the Servicing Agreement and the Credit Agreement

Numerous provisions in the Servicing and Credit Agreements are relevant to this decision.  Those provisions are set forth in the body of the opinion, as and when they are applied. The Court provides a brief overview of the relevant contractual provisions to provide context for the discussion that follows.

In addition to the definitions sections of both contracts. there are five sets of relevant provisions, three that relate to rights and obligations of the parties, and two that set forth remedies if there are breaches or other problems.

### a.     Modification of Loans

One of the principal disputes in this case concerns whether Metro has the right to defer interest payments on the underlying mortgage loans without WestLB's written consent.  Under Section 2.02(b) of the Servicing Agreement, Metro covenanted that it "will not waive, modify, release . . . or consent to postponement on the part of a Mortgagor of any term or provision of any Mortgage Loan without the prior written consent of . . . [WestLB]." (2l19 Hecht Decl. Ex. C at 8.)

In its attempt to avoid the plain language of Section 2.02(b), Metro relies on Sections 3.01(b) and 3.02(a) of the Servicing Agreement, as well as Schedule C to the Credit Agreement. Section 3.01(b) of the Servicing Agreement provides that, "Subject to the terms of this Agreement." Metro may "waive, modify or vary" the term of a loan if doing so is, in Metro's "good faith determination," not "materially adverse" to WestLB's interests and "is consistent with the Collection Policy." (Id.)

Section 3.02(a) of the Servicing Agreement provides that, "consistent with this Agreement," Metro "may in its discretion in accordance with the Collection Policy (i) waive any late payment charge . . . and (ii) arrange with a Mortgagor a schedule for the payment of interest and principal due and unpaid on the related Mortgage Loan." (Id. at 17.)

Schedule C to the Credit Agreement allows Metro to extend the maturity date of a loan "in accordance with the Collection Policy, for no more than two (2) extension periods of up to six (6) months apiece without the consent of [WestLB]." (Id. Ex. B at Schedule C, ¶ 5.)

### b.    Reporting Requirements

The Transaction Documents impose certain reporting requirements on Metro and MFC. In Section 2.01(g) of the Servicing Agreement, Metro warranted that "[a]ll written information" it furnishes to WestLB in connection with the loan transaction is "true and accurate in every material respect . . . and does not and will not contain any material misstatement of fact or be otherwise misleading in light of the circumstances under which such information was furnished." (2/19 Hecht Decl. Ex. C at 6.)

Section 4.01(a) of the Servicing Agreement requires Metro to provide WestLB with a "Monthly Report" that contains detailed information regarding the status of MFC's loans. (See id. at 27.) For purposes of the applications before the Court, the critical component of these

Monthly Reports is the "Borrowing Base" table, a spreadsheet that sets forth certain data for each loan in the portfolio.  The Borrowing Base is calculated as per the Credit Agreement.  (See id. Ex. B at Ex. 1 (Definitions).)  It is essentially a measure of the value of the outstanding loans— i.e., WestLB's collateral.

Each Monthly Report states the portfolio's "Delinquency Ratio," which is defined as the "outstanding Note Balance of Mortgage Loans that are Delinquent Mortgage Loans, expressed as a percentage of the outstanding Note Balance of all Eligible Loans owned by [MFC]."  A "Delinquent" loan is "any Mortgage Loan, including a Defaulted Mortgage Loan, as to which any payment or part thereof remains unpaid for thirty (30) days or more from the original Due Date for such payment or any extended Due Date in accordance with the Collection Policy." (Id.) An "Eligible" loan is. in turn, "a Mortgage Loan that . . . is not a Defaulted Mortgage Loan as to which any payment, or part thereof, remains unpaid for one-hundred eighty (180) days or more from the original Due Date for such payment or any extended Due Date in accordance with the Collection Policy."  (Id.)  Finally, a "Defaulted" loan is defined as "any Mortgage Loan . . . as to which any payment, or part thereof, remains unpaid for ninety (90) days or more from the original Due Date for such payment or any extended Due Date in accordance with the Collection Policy." (Id.)

### c.  Reimbursement of Expenses

The third set of provisions relevant to the instant applications relate to something called the Collection Account. and whether monies in that Account can be used to pay for what Metro calls "carrying costs" (taxes, insurance and other fees and expenses required to maintain the properties that secure the loans from Metro to the ultimate borrowers).

Section 3.07 of the Servicing Agreement provides that Metro is required "to pay all expenses incurred by it in connection with its activities hereunder . . . and shall not be entitled to reimbursement therefor except as specifically provided herein." (Id. Ex. C at 23.) The Servicing Agreement does not "specifically provide[]" for the reimbursement of carrying costs.

However. Metro claims that, if it pays carrying costs, it makes "Servicer Advances," which are defined as amounts Metro may fund for the payment of "interest and fees" on the mortgage loans (id. Ex. B at Ex. 1). Under Section 2.3 of the Credit Agreement, which sets forth the order in which available funds will be disbursed from the Collection Account (the so-called "waterfall"), funds in that Account must be used first to repay certain Servicer Advances. (See id. Ex. B at 6.)

### d.    Servicer Termination Events

Section 6.01(a) of the Servicing Agreement identifies thirteen separate "Servicer Termination Events," including those set forth in Sections 6.01(a)(i), (iv) and (v):

> (i)    [Metro] fails to perform or observe any covenant or agreement of the Servicer under . . . any . . . Transaction Document and such failure continues unremedied for five (5) Business Days after the written notification thereof by [WestLB] to [Metro];

> (iv)    the Delinquency Ratio exceeds thirty percent (30.00%) on any date of determination;

> (v)    the three-month rolling average of the Delinquency Ratio exceeds twenty-five percent (25.00%) on any date of determination.

(2/19 Hecht Decl. Ex. C at 31.)

Under Section 6.01(b), if a Servicer Termination Event occurs, "[WestLB] may, by notice given in writing to [Metro], terminate all of the rights and obligations of [Metro] as

Servicer under this Agreement." (Id. at 32.)  Upon Metro's receipt of such written notice, "all authority and power of [Metro] as Servicer . . . shall pass to and be vested in the Back-Up Servicer." (Id.)

### e.    Events of Default

Section 7.2(a) of the Credit Agreement provides that, upon the occurrence of an "Event of Default," WestLB may declare the outstanding amount of its loan to MFC (or any portion thereof), plus all accrued interest, immediately due and payable by MFC.  (2119 Hecht Decl. Ex. B at 34.)  The relevant Events of Default are set forth in Sections 7.1(ii) and (iii):

> (ii)   any representation, warranty, certification or statement made in writing by [MFC or Metro] in this Agreement or in or as required pursuant to any . . . Transaction Document (or any information or report delivered pursuant hereto or thereto) shall prove to have been false or incorrect in any material respect when made or deemed made and such failure, if capable of being remedied, shall continue thirty (30) days after the receipt by [MFC or Metro] of written notice with respect thereto from [WestLB] or [Wells Fargo] or actual knowledge thereof by an officer of [MFC or Metro] . . . .

> (iii)  [MFC or Metro] shall fail to perform or observe any other covenant or agreement under. . . any . . . Transaction Document to be performed or observed by it . . . and such failure shall remain unremedied for a period of thirty (30) days after the receipt by [MFC or Metro] of written notice with respect thereto from [WestLB] or [Wells Fargo] or actual knowledge thereof by an officer of [MFC or Metro].

(Id. at 32-33.)

### f.    Integration

Finally, the Credit Agreement and the Servicing Agreement are complete, detailed, fully-integrated agreements.  Section 12.9 of the Credit Agreement provides that, "This Agreement and each other Transaction Document contain the final and complete integration of all prior

expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all prior oral or written understandings." (Id. at 55; cf. id. Ex. C at 40 (Servicing Agreement Section 9.01(b) ("No provision of this Agreement may be amended, supplemented, modified or waived except in a writing executed by all of the parties hereto.")).)

## 2.    The Collection Policy

The Collection Policy is not a Transaction Document; it is an internal Metro document, drafted by Metro, which sets forth the procedures Metro will follow in servicing loans for its own account.  The Servicing Agreement obligates Metro to service the loans "in accordance with the Transaction Documents [and] the Collection Policy."  (2119 Hecht Decl. Ex. C at 16 (Servicing Agreement Section 3.02(a)).)

Section 2.02(a) of the Servicing Agreement provides that Metro

> will not make any change to such Collection Policy unless it delivers to [MFC] and [WestLB], at least thirty (30) days prior to the effectiveness of any change in or amendment to the Collection Policy, a copy of the Collection Policy then in effect and a notice indicating such change or amendment.  If such proposed change or amendment would in the sole discretion of [MFC] or [WestLB] be reasonably likely to materially adversely affect the collectibility of the Mortgage Loans generally or of a portion of the Mortgage Loans, then such change shall not take effect until [MFC] and [WestLB] shall have provided their prior written consent thereto.

(Id. at 8.)[2]

The parties submit two different versions of Metro's Collection Policy.  WestLB submits a version of the Collection Policy dated February 6, 2007.  (See Hellbusch Decl. Ex. 1.)  This was the version in effect at the time the parties executed the Transaction Documents on February

---

[2] The parties do not dispute that the original, February 2007 version of the Servicing Agreement included a substantially identical provision, requiring Metro to notify WestLB of proposed changes to the Collection Policy. (See 3110 Tr. 9:7-13.)

28, 2007.  Metro submits an amended version of the Collection Policy, dated November 13, 2007.  (See 2/19 Hecht Decl. Ex. A.)

The record before the Court establishes that the November 13, 2007 Collection Policy currently controls.  Despite WestLB's protestations otherwise, Metro appears to have complied with the Servicing Agreement's notice requirement by sending WestLB written notice of the proposed amendments, in a letter from Hecht to Hellbusch dated November 13, 2007.  (See Pls.' Prelim. Inj. Hr'g Ex. 1.)  WestLB did not object to the changes proposed by Metro within thirty days of receiving that letter, as permitted by the Servicing Agreement.  Therefore, those changes became effective on December 13, 2007, for purposes of Metro loans funded by WestLB.

The Court's conclusion that WestLB saw the revised Policy at or about the time it became effective is confirmed by two facts.  First, the amended Credit Agreement, dated July 1, 2008, which the parties agree is the governing version of that contract, defines the relevant terms "Delinquent Mortgage Loan" and "Defaulted Mortgage Loan" in accordance with the terms of the November 2007 Collection Policy, not those found in the earlier, February 2007 Collection Policy.  (See 2/19 Hecht Decl. Ex A at 11-12, Ex. B at Ex. 1; Hellbusch Decl. Ex. 1 at 11.)  Second, in May 2009, WestLB provided a copy of the November 13, 2007 Collection Policy to the consulting firm it engaged to review Metro's collection practices and the loans underlying the Credit Facility.  (See Hellbusch Decl. Ex. 3 (Due Diligence Rpt. for Metro Funding Corp. Prepared by Evergreen Collateral Consulting, June 6, 2009 ("Evergreen Rpt.")), at 8-9.)

The November 13, 2007 Collection Policy contains several relevant provisions, which will be described below as they become relevant.

### D.     The Deal Unfolds

Metro has originated more than thirty-five loans funded in part by the WestLB Credit Facility. (2/19 Hecht Decl. ¶ 33.)  On average, WestLB funded about 85 or 90% of each loan. (Id. ¶ 31.)  The balance of each loan was funded by other participants, including plaintiffs Satori and the Charitable Trust.  (See id.)  Satori and the Charitable Trust entered into Participation Agreements with Metro, pursuant to which they funded certain of the loans originated by Metro and, in exchange, obtained security interests in those loans and the properties securing them. (See Saban Decl. ¶¶ 4-5.)

The first loan funded by WestLB exemplifies the type of loans at issue.  The borrower was an entity called Redi LLC.  (Id. ¶ 32.)  The loan amount was $2.6 million; the collateral is 405 acres of land, initially appraised at $5.88 million, surrounding a ski resort in upstate New York.  (Id.)  WestLB funded $1.4 of the $2.6 million.  (Id.)  The term of the loan was originally two years, but has since been extended and is now scheduled to mature on March 27, 2010.)( The purpose of the loan was to allow Redi to refinance the land.  (Id.)

As we all know, the lending environment. especially for real estate, changed dramatically in late 2007 and early 2008 as a result of the global financial crisis.  (See id. ¶ 41.)  Many of Metro's borrowers were adversely affected, as they began having difficulty securing refinancing for their mortgaged properties; in addition, potential buyers of those properties were often unable to obtain purchaser financing.  (Id. ¶ 42.)  The properties securing the Credit Facility, initially appraised at $126 million, fell in value; Metro presently thinks the properties are worth "at least" $75 million.  (Id. ¶ 34.)  Currently, about $44.8 million is outstanding on WestLB's loan to MFC through the Credit Facility.  (See id. ¶ 34; Hellbusch Decl. ¶ 11.)

As the market collapsed, Metro began "working with its borrowers" in an effort to "maximize the value of the collateral." (2/19 Hecht Decl. ¶ 43.)  Sometimes, according to Hecht. "when a borrower advised Metro that it could not make the next interest payment in full, Metro used its discretion to work with the borrower to achieve a result that Metro in good faith believed was best for all." (Id.)  What that means is that Metro allowed the borrower to defer paying interest on the loan. (Id.)  Metro granted the first such extension as early as May 2008. (See id.; Hellbusch Decl. ¶ 25.)  In some cases, interest was deferred for a year or more. (See Hellbusch Decl. Ex. 9.)  It is undisputed that Metro did not obtain WestLB's written consent before extending the due dates for interest payments.

In May 2009, WestLB engaged Evergreen Collateral Consulting ("Evergreen") to review Metro's servicing practices and the loans underlying the Credit Facility. (See id. ¶ 16.)  On June 6, 2009, Evergreen provided WestLB with a report of its findings (the "Evergreen Report"). (See id. Ex. 3.)  The Evergreen Report informed WestLB that Metro had granted extensions on interest payments on at least five loans. (See id. at 16-17.)  The Evergreen Report notes that, "per [Metro] policy," extensions did not result in a loan's being considered delinquent in Metro's reporting. (See id. at 3, 16.)  The Evergreen Report also notes that Metro had included each of the extended loans as "Eligible" loans in its previous Report to WestLB. (See id. at 17.)

WestLB's Hellbusch avers that, prior to receiving the Evergreen Report, "WestLB did not know that Metro had agreed to extend interest payments on Mortgage Loans," and that "Metro had never disclosed this fact to WestLB either in its Reports pursuant to Servicing Agreement Section 4.01 or otherwise." (Id. ¶ 19.)  Metro's Hecht does not dispute that Valley National's bank reports did not specifically advise WestLB that Metro had deferred interest payments, but he claims that WestLB should have figured out that due dates had been extended,

because the bank reports showed less money going into the Collection Account.  (See 2/19 Hecht

Decl. ¶ 63; 3/10 Tr. 134:18-135:5, 135:13-136:23.)  Hellbusch disagrees, saying, "WestLB could

not determine from the amounts deposited into the Collection Account that Metro had extended

interest payments on various loans."  (Hellbusch Decl. ¶ 22.)

It is undisputed that Metro did not tell WestLB about interest deferrals in the Monthly

Reports it was required to provide.  (See 3/10 Tr. 136:8-16.)  WestLB submits as evidence the

Monthly Reports sent by Metro to WestLB in April, May, June and July of 2009.  (See

Hellbusch Decl. Exs. 4, 6.)  None of these reports indicates that Metro had extended interest

payments on some of loans.  (See id.)  In fact, as of July 2009, Metro had not received interest on

at least *seven loans* for more than *three months.*  (See id. Ex. 9.)  Yet the July 2009 Report shows

all of those loans as "current."  (See id. Exs. 6, 9.)  Hecht admits that what made them "current,"

rather than Delinquent, was the fact that he had given the borrowers permission to defer making

interest payments — for months at a time.  (See 2/19 Hecht Decl. ¶ 74.)

The Monthly Reports were not the only documents that characterized the loans in a

misleading manner.  Prior to the Evergreen Report, MFC obtained two "Subsequent Advances"

from WestLB—i.e., advances of funds from the Credit Facility — on May 28, 2009 ($799,000)

and June 30, 2009 ($3,700,000).  (See Hellbusch Decl. ¶ 21.)  In connection with its requests for

Subsequent Advances, MFC submitted documents to WestLB containing information about the

loans securing the advances.  (See id. Ex. 5.)  These documents, too, represented that the loans

on which no interest was being paid were "current."  (See id.)

In July 2009, after receiving the Evergreen Report, WestLB asked Metro and MFC for

more information about the loans underlying the Credit Facility.  (Id. ¶ 24.)  In response, on July

30, 2009, Metro sent WestLB a report titled "Loan Term Extension Summaries" (the "July 30

Summary"). (See id. Ex. 7.) The July 30 Summary described the "collateral," "purpose" and "interest payment status" for ten loans on which Metro had granted extensions. (See id.) From this document, WestLB first learned that interest payments had been deferred on about $15 million in loans. (See id. ¶¶ 24-25. Ex. 7.)

In Metro's Monthly Report for August 2009. the Borrowing Base table included—for the very first time—a column titled "Interest Payment Extension," which indicated that interest payments had been extended for five loans. (2/19 Hecht Decl. Ex. F; 3/10 Tr. 136:8-16.) The Borrowing Base table in Metro's Reports for the previous four months had not contained this information. (See Hellbusch Decl. Exs. 4, 6; 3/10 Tr. 136:8-16.)

Shortly thereafter, on August 25, 2009, WestLB sent Metro a written notice (the "August 25 Notice") asserting that Metro had breached various provisions of the Servicing and Credit Agreements. (See 2/19 Hecht Decl. Ex. H.) The August 25 Notice alleged, inter alia, that Metro had granted interest payment extensions on specified loans in violation of Section 2.02(b) of the Servicing Agreement, and also that Metro had breached Section 2.01(g) of the Servicing Agreement because Metro's description of the number of Eligible Loans in the July 2009 Monthly Report was inaccurate. (See id.) The August 25 Notice stated that these breaches constituted "Unmatured Events of Default under Section 7.01(ii) and (iii) of the Credit Agreement." 𝔛      Pursuant to the Credit Agreement, unless Metro "remedied" these breaches within thirty days, they would become mature Events of Default, and WestLB would have the right to call its loan to MFC. (See 2/19 Hecht Decl. Ex. B at 32-33.)

Metro did not respond by attempting to accelerate interest payments that it had deferred. Instead, Metro insists that it has a contractual right under the Servicing Agreement to defer

payment of interest at its discretion, as long as it believed in good faith that all involved would be better off if the loan was not thrown into default status. (See id. ¶¶ 60-61.)

Since August 25, the dispute has intensified. WestLB has continued to pay Metro its Servicing Fee out of the Collection Account, although Hecht avers that, "Metro has had to battle to receive [it] each month." (Id. ¶ 70; see id. ¶ 77.) According to Hecht, "The Servicing Fee is vital to Metro's existence." (Id. ¶ 39.)

However, WestLB has ceased allowing funds to be disbursed from the Collection Account to Metro for any purpose except payment of the Servicing Fee, including payment of carrying costs. (See id. ¶¶ 70, 77.) In addition, WestLB appointed a new Back-Up Servicer, Trimont Real Estate Advisors, Inc. ("Trimont"), as it was entitled to do under the Transaction Documents. (See id. ¶ 75 & Ex. M.) The release of Metro's September 2009 Servicing Fee was conditioned on its consenting to Trimont's appointment. (See id.)

Metro's October 2009 Monthly Report — like the August 2009 Report — identified five loans on which interest payments had been deferred. (See Hellbusch Decl. Ex. 8.) However, Metro continued to list all of the extended loans as "current," and reported a Delinquency Ratio of only 6.92%. (Id.)

Metro's reporting prompted WestLB to send Metro a letter on October 28, 2009, stating that WestLB would not release Metro's Servicing Fee unless Metro resubmitted a Monthly Report that "reflect[s] the correct payment status of each loan in the portfolio." (See 2/19 Hecht Decl. Ex. M.) WestLB asserted that "a significant number of the loans . . . that were reported as current were, in fact, delinquent," and implied that they must be re-reported as such. (See id. ¶ 74 & Ex. M.)

Metro, under protest, prepared subsequent Reports to conform to WestLB's directive. As a result, the landscape changed dramatically. The February 2010 Monthly Report, which is critical to the Court's analysis (and is discussed below). reports a Delinquency Ratio of 56.95% and a three-month rolling average Delinquency Ratio of 54.80%. (Hellbusch Decl. Ex. 9.) The Report acknowledges that both ratios are "Trigger Events" — that is, Servicer Termination Events. (See id.; 2/19 Hecht Decl. Ex. C at 31.) However, the February 2010 Report states that the ratios are "as per WestLB," and Metro claims that it only reported the higher ratios because WestLB had threatened not to pay its Servicing Fee unless it calculated the ratios as WestLB believed they should be calculated. (See Hellbusch Decl. Ex. 9; Hecht Reply Decl. ¶¶ 22-23.)

On February 17, 2010, WestLB informed Metro that it would not permit the disbursement of funds from the Collection Account to pay for expenses like taxes, property insurance, receiver fees and utility costs. (See 2/19 Hecht Decl. ¶¶ 2, 84.) Although the contracts make Metro responsible for paying these expenses, it appears that during the course of the deal, funds from the Collection Account may have been used to reimburse Metro for its payment of such carrying costs. (See Hecht Reply Decl. ¶ 11.)

On February 25, WestLB sent Metro and MFC written notice (the "February 25 Notice") terminating Metro as Servicer, and declaring the outstanding amount of its loan to MFC, plus accrued interest, immediately due. (See Decl. of David Hecht, Mar. 1, 2010 ("3/1 Hecht Decl."). Exs. A-B.)

## II.   Procedural History

On February 22, 2010, Metro filed its Complaint, along with an order to show cause. (Docket Nos. 1, 3.) Metro sought to temporarily restrain WestLB from, inter alia, preventing Metro from being reimbursed from the Collection Account for carrying costs. and/or withholding

Metro's Servicing Fee.  (See Docket No. 3.)  Metro's request for a temporary restraining order was denied; a hearing was scheduled for February 26 on Metro's application for a preliminary injunction seeking the same relief.  (Id.)

On February 25, Metro consented to WestLB's request to adjourn the hearing scheduled for February 26.  (3/1 Hecht Decl. ¶ 3.)  The Court approved via memo endorsement the parties' joint request to adjourn the hearing to March 10.

Also on February 25, WestLB sent Metro and MFC the Notice terminating Metro as Servicer and declaring the balance of the loan to MFC immediately due.  Metro did not see the termination Notice until February 27 (and thus was not aware that it had been terminated when it consented to an adjournment of the hearing).  (See id. ¶ 5.)

On the next business day, March 1, Metro filed another order to show cause.  (Docket No. 9.)  This time, Metro sought a temporary restraining order and preliminary injunction enjoining WestLB from terminating Metro and from demanding immediate repayment of the $44.8 million owed by MFC to WestLB.  (Id.)  The Court granted Metro's request for a temporary restraining order, set a briefing schedule and advised the parties that both of Metro's preliminary injunction applications would be addressed at the March 10 hearing.

The March 10 hearing consisted of oral argument and the testimony of one witness, David Hecht.  After the hearing, the Court accepted supplemental briefing on a discrete legal question related to the implied covenant of good faith and fair dealing.

Having considered the record before it, the Court denies Plaintiffs' applications for preliminary injunctive relief.

## DISCUSSION

**I.      Legal Standard for Obtaining a Preliminary Injunction**

In the Second Circuit, a party seeking a preliminary injunction "must demonstrate: (1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, and (2) irreparable harm in the absence of the injunction." Faively Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 116 (2d Cir. 2009) (internal quotations and citations omitted).  The Second Circuit recently upheld the "continued viability of the 'serious questions' standard," despite the Supreme Court's decision in Winter v. NRDC, Inc., 129 S. Ct. 365 (2008), which many courts have viewed as calling that standard into question.  Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., No. 08 Civ. 6090, 2010 U.S. App. LEXIS 5025, at *11-23 (2d Cir. Mar. 10, 2010).

It is well established that a preliminary injunction "is not a remedy which issues as of course."  Weinberger v. Romero-Barcelo, 456 U.S. 305, 311 (1982) (quoting Harrisonville v. W. S. Dickey Clay Mfg. Co., 289 U.S. 334, 337-38 (1933)).  Rather, a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter, 129 S. Ct. at 375-76; accord Sussman v. Crawford, 488 F.3d 136, 140 (2d Cir. 2007).  "[I]n making such a showing the movant bears a heavy burden."  New York v. Nuclear Regulatory Comm'n, 550 F.2d 745, 750 (2d Cir. 1977).

**II.     Plaintiffs Have Failed to Show a Likelihood of Success or Sufficiently Serious Questions Going to the Merits of Their Claims**

Plaintiffs' applications for preliminary injunctive relief implicate two of the five causes of action in the Complaint: Metro's claim for breach of contract, and the claims of all three Plaintiffs for impairment of security.

For the reasons set forth below, Plaintiffs have not shown sufficiently serious questions going to the merits of these claims, let alone likelihood of success on the merits, and are thus not entitled to preliminary injunctive relief.

### A.    Plaintiffs Lack Standing to Seek Relief Under the Credit Agreement

Plaintiffs Metro, Satori and the Charitable Trust ask this Court to enjoin WestLB from demanding immediate repayment of its loan to MFC under the *Credit Agreement.* Yet none of the Plaintiffs is a party to the Credit Agreement. MFC, not Metro, is the party to that contract, although breaches of other agreements by Metro can be "Events of Default" under the Credit Agreement. Thus, Plaintiffs lack standing to seek an order enjoining WestLB from calling its loan to MFC under the Credit Agreement.

Metro effectively concedes the point. In its reply brief, Metro responds to WestLB's standing challenge by asserting that relief under the Credit Agreement did not become an issue in this case until February 25, when WestLB called its loan to MFC. (See Metro Reply Mem. in Further Supp. of Pls.' App. for TRO and Prelim. Inj., Mar. 8, 2010 ("Metro Reply"), at 9.) This occurred *after* Metro had filed its Complaint (and its initial application for preliminary injunctive relief). This is hardly compelling. MFC—a party to both the Credit *and* Servicing Agreements—could and perhaps should have been a plaintiff since day one. But MFC has made no effort to intervene in the action since February 25, when its interests were plainly implicated by the litigation.

Plaintiffs Satori and the Charitable Trust are not parties to any of the Transaction Documents. In their brief in support of their application for preliminary injunctive relief, they assert only that they have standing, as Senior Participants, to enjoin WestLB "from preventing Metro from using funds from the Collection Account to preserve and maintain the properties."

(See Reply Mem. of Satori and Charitable Trust in Further Support of Mot. for Prelim. lnj., Mar. 8, 2010 ("Satori/Charitable Trust Mem."), at 2-3.)  In fact, they do not claim to have standing to seek an injunction enjoining WestLB from exercising its rights vis-a-vis MFC under the Credit Agreement.  (See id.)

Accordingly, Plaintiffs' application for a preliminary injunction to forestall WestLB from enforcing its rights under the Credit Agreement is denied for lack of standing.[3]

### B.    WestLB Has the Right to Terminate Metro as Servicer Because the Delinquency Ratio Exceeds 30%

Metro seeks a preliminary injunction restraining WestLB from terminating it as Servicer of the underlying mortgage loans.  Metro's application fails because at least one and probably several "Servicer Termination Events" have occurred.

The Servicing Agreement gives WestLB the right to terminate Metro as Servicer if certain Servicer Termination Events occur.  If the "Delinquency Ratio" exceeds 30%, or if the three-month rolling average Delinquency Ratio exceeds 25%, there has been a Servicer Termination Event.  (2119 Hecht Decl. Ex. C at 31 (Servicing Agreement Sections 6.01(a)(iv)-(v)).)

The facts adduced at the March 10 hearing make it clear beyond peradventure that, if the Delinquency Ratio is calculated as per the Transaction Documents, there is no question that both events—and certainly the former—have occurred.  WestLB therefore has the right to terminate Metro as Servicer, and Metro is unlikely to prevail on its claim that it is entitled to enjoin termination.

---

[3] Even if Plaintiffs did have standing, their application to enjoin WestLB from calling its loan to MFC would fail. Metro's breaches of the Servicing Agreement, discussed infra at Discussion II.C., constitute Events of Default under Sections 7.1(ii) and (iii) of the Credit Agreement.  (See 2/19 Hecht Decl. Ex. B at 32-33.)  Pursuant to Section 7.2, when an Event of Default has occurred, WestLB has a contractual right to declare its loan to MFC immediately due and payable.  (See id. at 34.)

### 1.    The Delinquency Ratio Exceeds 30%

The Credit Agreement defines the Delinquency Ratio as: "The outstanding Note Balance of Mortgage Loans that are Delinquent Mortgage Loans, expressed as a percentage of the outstanding Note Balance of all Eligible Loans." (Id. Ex. B at Ex. 1.) Simply stated, the Delinquency Ratio is the following fraction, expressed as a percentage:

$$\frac{\text{outstanding balance of all Delinquent loans}}{\text{outstanding balance of all } \textit{Eligible} \text{ loans}}$$

Thus, if a loan is both "Delinquent" and not "Eligible," the loan must be included in the numerator and excluded from the denominator of the Delinquency Ratio.

A "Delinquent" loan is defined as any loan "as to which any payment or part thereof remains unpaid for thirty (30) days or more from the original Due Date for such payment or any extended Due Date in accordance with the Collection Policy." (Id.) An "Eligible" loan is "a Mortgage Loan that . . . is not a Defaulted Mortgage Loan as to which any payment, or part thereof, remains unpaid for one-hundred eighty (180) days or more from the original Due Date for such payment or any extended Due Date in accordance with the Collection Policy." (Id.)

At the March 10 hearing, Hecht was examined at length regarding the status of certain loans in the MFC portfolio. Hecht admitted that seven specific loans, with a total outstanding balance of $14,942,000, are both Delinquent and not Eligible, as those terms are defined in the Credit Agreement. (See 3/10 Tr. 149:19-150:18 (Logic Suites loan), 151:21-152:2 (Jennings loan), 152:3-18 (BDM loan), 152:19-22 (Phase II loan), 159:15-19 (Annie Brown Williams loan), 159:20-160:2 (JC Developers loan), 163:1-5 (Riverstar loan).) Those loans are summarized in the table below, with relevant data as it appears in Metro's February 2010 Monthly Report (see Hellbusch Decl. Ex. 9):

| Borrower | Status as of Original Interest Due Date | Status as per MFC's Payment Plan | Action Taken | Date of Last Interest Payment Rec'd | Rescheduled Interest Due Date | Current Loan Balance |
|---|---|---|---|---|---|---|
| Logic Suites | REO | REO | REO (Real Estate Owned) | 11/24/08 | | $1,600,000 |
| Jennings | 120+ (days overdue) | Default | Foreclosure/receivership | 9/1/08 | 11/1/09 | $1,100,000 |
| BDM | 120+ | Default | Foreclosure | 1/28/09 | 12/20/09 | $2,600,000 |
| Phase II Land Trust | REO | REO | REO | | | $2,771,000 |
| Annie Brown Williams | 120+ | | Foreclosure | 7/20/09 | | $1,946,000 |
| JC Developers | 120+ | | Foreclosure | 7/9/09 | | $3,875,000 |
| Riverstar | 120+ | 120+ | Foreclosure | 7/1/09 | | $1,050,000 |
| | | | | | TOTAL: | $14,942,000 |

In addition. Hecht admitted that the Twin Builders loan, with an outstanding balance of $1.3 million. is Delinquent, although he suggested that it should still be considered Eligible. (3110 Tr. 160:3-161:4.)

If the Delinquency Ratio is computed as per the literal terms of the contract, the numerator should be $16,242,000 (the sum of all eight admittedly Delinquent loans).

Per the February 2010 Report, the total outstanding balance of all loans (whether Eligible or not) is $63,112,582.  (See Hellbusch Decl. Ex. 9; 3110 Tr. 170:3-5.)  In order to compute the denominator of the fraction, we subtract from that number the total amount outstanding on non-Eligible loans.  According to Hecht, there are seven non-Eligible loans with a balance of $14,942,000.  Subtracting $14,942,000 from $63.112,582 yields a denominator of $48,170,582.

Using these numbers. the Delinquency Ratio is: $16,242,000 / $48,170,582 = 33.7%.

Since the Delinquency Ratio exceeds 30%, WestLB has the right to terminate Metro as Servicer.

**2.      Metro's Inclusion of Non-Eligible Loans in the Denominator of the Delinquency Ratio Violates the Terms of the Contracts**

According to Metro, the Delinquency Ratio is less than 30%.  However, Metro's calculation of the Delinquency Ratio violates the terms of the Transaction Documents, because it fails to exclude non-Eligible loans from the denominator.

In its Monthly Reports, Metro has been incorrectly including the outstanding balance of all loans as the denominator of the Delinquency Ratio, whether they were "Eligible" or not. When Hecht was confronted at the March 10 hearing with the calculation performed above— yielding a Delinquency Ratio of 33.7% — he suggested that the calculation was wrong because the seven admittedly non-Eligible loans should not have been excluded from the denominator when calculating the Delinquency Ratio.  (See id. 163:6-164:12, 165:10-14, 171:12-23.)

But there is no support in the contracts for Hecht's position.  The plain language of the Credit Agreement establishes that the denominator of the Delinquency Ratio is the outstanding balance of Eligible loans, not the total outstanding balance of all loans.

Thus, Hecht's admission that there are seven Ineligible loans dooms Metro's argument that the denominator of the fraction should be $63 million instead of $48 million.

**3.      Including All Delinquent Loans in the Numerator of the Delinquency Ratio Shows That It Likely Far Exceeds 30%**

Arriving at a Delinquency Ratio of only 33.7% actually requires interpreting the February 2010 Report in a manner that is highly *favorable* to Metro.  The true Delinquency Ratio is almost certainly far greater than that.

Thirteen of the thirty-nine loans in the February 2010 Report's Borrowing Base table are listed as having interest payments at least thirty days overdue "as per MFC's Payment Plan"—in other words, thirteen loans are currently Delinquent, even allowing for Metro's extension of the

due dates for interest.  The outstanding balance of those thirteen Delinquent Loans—i.e., the numerator of the Delinquency Ratio—is $28,997,582, which is far more than the $14,942,000 used in the prior calculation.  That means the true Delinquency Ratio is closer to 50% than to 30%.

Metro responds that these additional loans should not be considered Delinquent because WestLB has prevented Metro from continuing to grant extensions to the mortgagors.  (See 3/10 Tr. 182:7-9.)  That argument is meritless for several reasons.

First, as will be discussed below, Metro does not have the right to grant any such extensions without obtaining WestLB's prior written consent.  See supra Discussion II.C.1.  The very fact that Metro stopped granting extensions when WestLB instructed it to do so supports this interpretation of the contracts.  Metro's failure to obtain WestLB's written consent before deferring interest payments constitutes an independent breach of the Servicing Agreement, and qualifies as another Servicer Termination Event.

However, assuming that Metro did have a contractual right to grant extensions without WestLB's consent, it is undisputed that Metro had to comply with "accepted mortgage servicing practices of prudent lending institutions," and with its own Collection Policy, when it grants extensions.  (See 2/19 Hecht Decl. Ex. C at 16 (Servicing Agreement Section 3.01(a)).)  Metro's Collection Policy only allows it to extend due dates when Metro "reasonably determines that the loan and payments thereon remain collectible."  (See id. Ex. A at 11.)  The record before the Court shows that Hecht has repeatedly deferred interest payments on loans that are plainly non-performing—some of which are already in foreclosure.  That is hardly consistent with either "prudent" lending practices or Metro's Collection Policy—which undoubtedly explains why

Metro offers no evidence that "accepted mortgage servicing practices of prudent lending institutions" would permit such extensions.

Take, for example, the $3.8 million loan to Waterfront Owners ("Waterfront"). which last paid interest more than a year ago. (<u>See</u> Hellbusch Decl. Ex. 9.) In his testimony, Hecht admitted that he is simply "hoping and praying" that the borrower will ultimately obtain the refinancing that will (supposedly) allow it to make good on its obligations. (3/10 Tr. 126:23-127:2.) This Court does not believe that Metro will prevail on the argument that "hoping and praying" qualify as a prudent lending practice—especially since Waterfront has been "hoping and praying" for refinancing since February 2009! In short, the Waterfront loan, like many other loans in the portfolio, is properly considered Delinquent.

Metro attempts to minimize the persuasiveness of the February 2010 Report by protesting that it is the product of coercion — that Metro would not have reported data yielding a Delinquency Ratio above 30% if WestLB had not forced it to do so. (<u>See</u> Hecht Reply Decl. ¶¶ 22-23.) It is irrelevant (for these purposes, although not for others) that Metro, if left to its own devices, would have continued to misreport the Delinquency Ratio, or that it would have continued to extend interest due dates so that it could pretend to WestLB that non-performing loans were current. What matters is whether the data reported in the February 2010 is accurate under the terms of the contracts. If the Delinquency Ratio is calculated in accordance with the Transaction Documents, Hecht's own testimony confirms that the data is indeed accurate. There is no way around the fact that a significant number of the loans in the portfolio — many of which have not paid interest in more *than a year*—cannot be considered performing loans pursuant to the Transaction Documents (or common sense).

In sum, the Court concludes that the Delinquency Ratio exceeds — and likely far exceeds — 30%. For that reason alone, WestLB has the right to terminate Metro as Servicer Metro effectively concedes as much. Therefore, Metro is not likely to succeed on its claim that WestLB lacks authority to terminate it, and its application for a preliminary injunction is denied."

### 4. The Principle of Good Faith and Fair Dealing Does Not Provide a Basis for Enjoining WestLB from Exercising Its Right to Terminate Metro

At the very end of the March 10 hearing, Metro invoked the principle of good faith and fair dealing in a last-ditch effort to avoid termination. (See 3/10 Tr. 180:14-181:2; Metro Supplemental Mem., Mar. 11, 2010, at 1-2.) Metro notes that WestLB's contractual right to terminate Metro in the event of a Servicer Termination Event is discretionary, not mandatory. It argues that WestLB's exercise of that right would violate its obligation of good faith and fair dealing, because it is in all parties' best interest to let Metro and Hecht — who knows these loans better than anyone else — continue servicing the loans. This is a self-serving — and utterly unpersuasive — argument, especially in light of Metro's dismal management of the portfolio to date. It also finds no support in the case law.

Under New York law, where, as here, a contract permits a party to terminate upon the occurrence of a certain event, that party may terminate if the event occurs. The party's motivation for exercising its right to terminate is "legally irrelevant." See Major Oldsmobile v. GMC, No. 95 Civ. 7595, 1996 U.S. App. LEXIS 11443, at *7 (2d Cir. May 17, 1996); Refinemet Int'l Co. v. Eastbourne N.V., 815 F. Supp. 738,742 (S.D.N.Y. 1993), aff'd, 25 F.3d 105 (2d Cir. 1994). In the simplest terms, a termination that occurs following a termination event *cannot* be a "bad faith" termination.

---

[4] It is also quite likely, as WestLB argues, that the three-month rolling average of the Delinquency Ratio exceeds 25%. However, the Court does not need to reach that question.

The five cases cited by Metro do not suggest otherwise. Instead, they merely establish that where a contract gives a party unfettered discretion to take some action regardless *of the* circumstances — which is hardly the case here — that party's motive and good faith may be relevant. The cases Metro cites also acknowledge that the implied covenant of good faith and fair dealing cannot impose obligations that are inconsistent with specific contractual terms. See, e.g., Creative Waste Mgmt. v. Capitol Envtl. Servs., 429 F. Supp. 2d 582, 609 (S.D.N.Y. 2006); see also, e.g., Travellers Int'l, A.G. v. Trans World Airlines, 41 F.3d 1570, 1575 (2d Cir. 1994); Madison Capital Co., LLC v. Alasia, LLC, 615 F. Supp. 2d 233. 239 (S.D.N.Y.2009); Outback/Empire I, Ltd. P'ship v. Kamitis, Inc., 825 N.Y.S.2d 747, 747 (App. Div. 2006); Bruce & Co. v. J. Simpson & Co. Inc., 243 N.Y.S.2d 503, 506 (Sup. Ct. 1963).

For example, in Creative Waste Management, the dredging contract at issue provided that, when unanticipated work arose, the plaintiff-contractor was required to give defendant advance written notice of its proposed compensation for performing the extra work. 429 F. Supp. 2d at 610. The contract gave the defendant absolute discretion to decide "whether to have the work completed by the contractor or to have [the] work done on a 'Cost Plus' basis." Id. The court (Connor, J.) held that, "Therefore, there is an implied covenant that [defendant] will not act arbitrarily or irrationally in exercising that discretion." Id. (internal quotations omitted). Judge Conner acknowledged, however, that "no obligation can be implied that would be inconsistent with explicit, bargained-for contractual terms." Id.

Here, WestLB has the explicit, bargained-for right to terminate based upon a specific, bright-line trigger event — when the Delinquency Ratio exceeds 30%. It does not have absolute discretion to terminate Metro regardless of the circumstances. Thus, Creative Waste Management, and the other cases cited by Metro, are entirely inapposite.

Moreover, even if WestLB's motive *were* relevant — which it is not — it does not lie in Metro's mouth to invoke the spirit of good faith and fair dealing.  If any party has violated that covenant, it is Metro, which has blatantly breached its obligation to report information about the loans to WestLB accurately.

Metro admits that it began deferring interest payments as early as May 2008, but that it did not explicitly advise WestLB that it had deferred interest on a single loan until the summer of 2009 — and then, only *after* WestLB had inquired about extensions.  Metro did not disclose the extensions, even though interest from the loans was "the gas" that ran "the engine" of the deal.  (See 3/10 Tr. 50:4-9.)  As WestLB's Hellbusch explains, "A key economic value" of the deal for WestLB is "timely *interest* payments" on the underlying properties.  (Hellbusch Decl. ¶ 32 (emphasis added).)  Metro was well aware of that fact, yet it failed to advise WestLB that loan after loan was in default because borrower after borrower was not able to pay interest as it came due.

Even after it was caught red-handed, Metro did not come clean with WestLB.  The July 30 Summary that Metro sent to WestLB, describing ten loans on which payments had been deferred, was materially misleading.  One of the loans described in the July 30 Summary is the $1.95 million loan to Annie Brown Williams, Inc. ("ABW").  (Id. Ex. 7.)  The loan was secured by a motel and fifty-five acres of land in Mississippi.)(    The July 30 Summary states that Metro granted a six-month extension in September 2008 when the borrower was unable to pay interest, but that the loan was brought current in early 2009, "bringing the interest payment due dates to the original monthly interest payment schedule."  (Id.)  A fair reading of the Summary is that the loan had been made current, interest was now being paid on the original schedule, and all

was well.  Hecht himself testified that the July 30 Summary is a rather "cheerful sounding document."  (See 3/10 Tr. 158:21-159:8.)

The July 30 Summary does not disclose that the borrower had paid no interest after bringing the loan current in early 2009.  Nor does it disclose that Metro had put the properties into foreclosure earlier in July 2009, the same month it sent the "cheerful sounding document" to WestLB.  (See Hellbusch Decl. Ex. 7; 3/10 Tr. 158:11-159:8.)[5]  The sunny situation described by Metro in its "disclosure" was nonexistent; the loan was already in foreclosure at the time the Summary was given to WestLB.  Hecht admits that Metro does not "foreclose on performing loans."  (3/10 Tr. 132:2-4.)  Yet it gave WestLB a document that made a loan in foreclosure sound like a performing loan.

Metro had a contractual obligation to ensure that all written information it provides to WestLB is "true and accurate in every material respect . . . and does not and will not contain any material misstatement of fact or be otherwise misleading in light of the circumstances under which such information was furnished."  (2/19 Hecht Decl. Ex. C at 6.)  The July 30 Summary blatantly violated Metro's reporting obligation and was certainly not an instance of good faith or fair dealing on Metro's part.  Having violated the covenant (and numerous explicit contractual provisions as well), Metro is in no position to invoke it.

It is not the Court's role to decide whether WestLB's exercise of its discretionary right to terminate Metro would be a sound business decision.  The Court notes, however, that while Plaintiffs insist that terminating Metro and Hecht will jeopardize the underlying collateral, it seems equally plausible that instituting a new Servicer with more stringent collection policies

---

[5] The February 2010 Monthly Report indicates that interest was last received from ABW on July 20, 2009, after the large payment that brought the loan current, which Hecht testified was made earlier in 2009.  (See Hellbusch Decl. Ex. 9; 3110 Tr. 158:11-20.)  Neither the July 30 Summary nor Hecht's unambiguous testimony about the ABW loan makes any reference to any such payment.  Regardless, the ABW loan was *inforeclosure,* and the July 30 Summary omitted that fact.

will enhance WestLB's chances of salvaging some portion of its investment on these non-performing loans.  Regardless, it is the Court's duty only to determine what the parties' *contractual rights* are, and it has done so.

At the end of the day, this is a commercial loan agreement between sophisticated parties. The simple fact is that the deal is seriously under water.  The Delinquency Ratio trigger event has occurred.  That gives WestLB the unilateral right to decide whether Metro should continue as Servicer.  Given Metro's deceitful and underhanded behavior toward WestLB, it will come as no surprise to the Court if WestLB makes good on its threat.  I certainly have no power to enjoin it.

Accordingly, for the reasons stated above, the Court finds that Metro is not likely to succeed on its claim that WestLB has no right to terminate it as the Servicer of the loans under the Transaction Documents.[6]

### C.      Metro, Not WestLB, Has Breached the Servicing Agreement

Even if the Delinquency Ratio did not exceed 30%, Metro's applications for preliminary injunctive relief would fail because Metro, not WestLB, is the party in breach of its obligations under the Servicing Agreement.  Metro has breached the Servicing Agreement by (1) granting interest payment extensions without WestLB's prior written consent, and (2) failing to disclose those extensions in its Monthly Reports to WestLB.  Metro's failure to obtain WestLB's written consent before deferring interest payments qualifies as a Servicer Termination Event, providing WestLB with an additional ground for terminating Metro as Servicer.

---

[6] No cause of action in the Complaint specifically addresses this issue; Metro did not bother to amend the Complaint to add any new cause of action when it served its second order to show cause on March 1, 2010.

1.     **Metro's Modification of Loans Without WestLB's Written Consent
Constitutes a Breach of the Servicing Agreement**

Metro has breached Section 2.02(b) of the Servicing Agreement because it extended

interest payments without obtaining WestLB's prior written consent.

Section 2.02(b)—one of the "Affirmative Covenants of the Servicer"—provides that

Metro "will not waive, modify, release . . . or consent to postponement on the part of a

Mortgagor of any term or provision of any Mortgage Loan without the prior written consent

of . . . [WestLB]." (2/19 Hecht Decl. Ex. C at 8.)  Section 2.02(b) is anything but ambiguous—

Metro covenanted that it would obtain WestLB's written consent before granting interest

payment extensions.  It did not do so.  Metro admits that it began deferring interest payments in

May 2008. and that it did not obtain WestLB's written consent (or even notify WestLB) before

granting those extensions.

a.     **Other Provisions in the Transaction Documents Do Not
Contradict Section 2.02(b)'s Written Consent Requirement**

Metro maintains that it is likely to prevail against WestLB's contention that the interest

payment extensions breached the Servicing Agreement, because other provisions of the

Transaction Documents gave it sole discretion to let borrowers defer paying interest on the MFC

loans.  Metro relies on several contractual provisions that it claims conflict with Section 2.02(b)

of the Servicing Agreement.  They do not.

First. Metro points to Section 3.01(b) of the Servicing Agreement, which provides that

> Subject to the terms of this Agreement. [Metro] may waive,
> modify or vary any term of any Mortgage Loan or consent to the
> postponement of strict compliance with any such term or in any
> manner grant indulgence to any Mortgagor if in [Metro's] good
> faith determination such waiver, modification, postponement or
> indulgence is not materially adverse to the interests of [MFC] or
> [WestLB] and is consistent with the Collection Policy.

(2119 Hecht Decl. Ex. C at 16.)

Metro also cites Section 3.02(a) of the Servicing Agreement, which requires that

> [Metro] shall use its best efforts to collect all payments called for
> under the terms and provisions of the Mortgage Loans and shall, to
> the extent such procedures shall be consistent with this Agreement,
> follow such collection procedures as it follows with respect to
> mortgage loans that it services for its own account.  Consistent
> with the foregoing, and without limiting the generality of the
> foregoing, [Metro] may in its discretion in accordance with the
> Collection Policy (i) waive any late payment charge or any
> assumption fees or other fees which may be collected in the
> ordinary course of servicing such Mortgage Loan and (ii) arrange
> with a Mortgagor a schedule for the payment of interest and
> principal due and unpaid on the related Mortgage Loan.

(Id. at 17.)

Finally, at the March 10 hearing, Metro's counsel directed the Court to paragraph 5 of

Schedule C to the Credit Agreement, pursuant to which Metro makes the following

representation each time WestLB advances funds from the Credit Facility to MFC:

> [Each] Mortgage Loan is required to be paid in full within thirty
> six (36) months and has not had its maturity date or other payment
> terms extended (other than as set forth below) for any reason;
> provided, however, that (i) pursuant to the Servicing Agreement
> the maturity date of a Mortgage Loan that is not a Defaulted
> Mortgage Loan and not a Delinquent Mortgage Loan can be
> extended by [Metro], in accordance with the Collection Policy, for
> no more than two (2) extension periods of up to six (6) months
> apiece without the consent of [WestLB].

(Id. Ex. B at Schedule C, ¶ 5.)

Section 3.01(b) of the Servicing Agreement does not contradict Section 2.02(b).  Section

3.01(b) expressly provides that Metro's right to modify a loan is "Subject to the terms of this

Agreement."  (Id. Ex. C at 16.)  Section 2.02(b) is one of the terms of the Agreement to which

Section 3.01(b) is subject.  Section 2.02(b) requires Metro to get WestLB's consent before

extending the due date on any interest payment.

Similarly, Section 3.02(a) of the Servicing Agreement provides that Metro's arranging of payment schedules must be "Consistent with the foregoing" clause in that Section, which in turn requires that Metro's collection procedures be "consistent with this Agreement." (Id. at 17.) Thus, Section 3.02(a), like Section 3.01(b), plainly requires that Metro's practices comply with other terms in the Servicing Agreement, including Section 2.02(b).

Schedule C is irrelevant because it applies only to the extension of loan maturity dates, not to the deferral of interest payments. In fact, if anything, Schedule C confirms that the modification of "other payment terms"—which can only be interpreted as including interest payment due dates—requires "the consent of [WestLB]." (See id. Ex. B at Schedule C, ¶ 5.)

Standard principles of contract construction require that meaning be given to every term in a contract. Sections 2.02(b), 3.01(b) and 3.02(a) of the Servicing Agreement, and Schedule C of the Credit Agreement, read together. establish the following regime: Metro may indeed modify or postpone the terms of loans, but subject *to* other, more specific *contractual provisions*. Metro must obtain WestLB's prior written consent pursuant to Section 2.02(b) (except for certain extensions of maturity dates provided for in Schedule C); Metro must comply with its internal Collection Policy, which allows extensions only if Metro reasonably believes the payment remains collectible; and Metro must act in accordance with industry standards. In other words, the contracts contemplate that Metro, as the expert in servicing the type of loans at issue, will have the ability to modify their terms, subject to certain contractual limitations. The most important such limitation is that WestLB must be notified of—and have the opportunity to reject—proposed deferrals of the interest payments that are so critical to WestLB's return on the transaction.

In its attempt to get around Section 2.02(b)'s written consent requirement, Metro invokes the well established principle of contractual interpretation that the specific governs the general. See, e.g., Uniwire Trading LLC v. M/V Wladyslaw Orkan, 622 F. Supp. 2d 15, 19 (S.D.N.Y. 2008) ("It is axiomatic that 'specific terms and exact terms are given greater weight than general language.'" (quoting Restatement (Second) of Contracts § 203(c))). However, that principle works against Metro in this case. Section 2.02(b) is specific, and it is clear; in fact, it is the clearest provision of any that are at issue. Metro's counsel acknowledges that the "language" of Section 2.02(b) is "really specific," but argues that Sections 3.01(b) and 3.02(a) should nevertheless control because they are found in the "Servicing" section of the contract, which is—the argument goes—more specific than the "general section[]" containing Metro's "Representations, Warranties and Covenants" (one of which is Section 2.02(b)). (See 3/10 Tr. 18:10-25.) The Court finds this argument unpersuasive. A specific, clearly stated Covenant made by one of the contracting parties can hardly be considered a "general" provision.

Metro also asserts that pursuant to the rule of *contra proferentem*, ambiguous language in the Servicing Agreement must be construed against its drafter, WestLB. See, e.g., C.P. Apparel Mfg. Corp. v. Microfibres, Inc., 210 F. Supp. 2d 272, 276 (S.D.N.Y. 2000). However, for the reasons stated above, the Court does not find the language in Section 2.02(b) to be at all ambiguous. Further, application of contra *proferentem* is "generally inappropriate if both parties are sophisticated," as they are here. See Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 88 n.7 (2d Cir. 2002) (citing U.S. Fire Ins. Co. v. Gen. Reins. Corp., 949 F.2d 569, 573 (2d Cir. 1991)). Thus. *contra proferentem* has no application to the Transaction Documents. Both sides are sophisticated and were represented by competent counsel; while the documents were initially drafted by WestLB's lawyers, the finished product was the result of negotiation.

> **b.**    **Metro's Internal Collection Policy Does Not Contradict the Prior Written Consent Requirement**

Finally, Metro points to its internal Collection Policy in support of its contention that it has the right to defer interest payments at its sole discretion.  Two sections in Metro's amended, November 13, 2007 Collection Policy are relevant; those sections provide, in relevant part:

> **12.  Delinquency Process**
>
> . . . .  [Metro's] senior management will take all steps reasonably necessary to resolve the problem [of nonpayment] and return the loan to a performing status.  *Modifications or alterations of loans, however, are not permitted. . . .*
>
> [Metro] loans are generally considered delinquent if the regularly scheduled interest payment is not made within 30 days of the date due *or any extended due date if [Metro] reasonably determines that the loan and payments thereon remain collectible.*
>
> **13.  Default Process**
>
> [Metro] will declare a loan defaulted i f . . . any payment, or part thereof, remains unpaid for ninety (90) days or more from the original due date for such payment *or any extended due date if [Metro] reasonably determines that the loan and payments thereon remain collectible.*

(2119 Hecht Decl. Ex. A at 12-13 (emphasis added).)

The corresponding sections in Metro's earlier, February 6, 2007 Collection Policy, which was in effect when the Transaction Documents were signed, make no reference to *extended* due dates.  (See Hellbusch Decl. Ex. 1 at 11.)  But the earlier Collection Policy, like the amended version, provides that, "Modifications or alterations of loans *are not permitted."*  (Id. (emphasis added).)

Metro's reliance on its Collection Policy is misplaced.  First, and most important, is this: regardless of how the Collection Policy is interpreted, *the Collection Policy does not govern this dispute.*  The Collection Policy only controls Metro's servicing of loans for its *own* account.

Metro is not servicing these loans for its own account; instead, it is servicing them for WestLB, pursuant to a contract between the two entities — the Servicing Agreement.  That contract requires Metro to "comply in all material respects with the Collection Policy" (2/19 Hecht Decl. Ex. C at 8), but it also — as one would expect — grafts certain limitations on Metro's internal practices.  Critical among them is the prior written consent requirement in Section 2.02(b), which applies to Metro's right to "waive, modify, release . . . or consent to postponement . . . of any term or provision of any Mortgage Loan." (Id.)  Extending—i.e., postponing — the due date of an interest payment falls squarely within the language of Section 2.02(b).

The language of the Collection Policy does not help Metro either.  Any ambiguities in the Collection Policy must be construed against Metro, which drafted it unilaterally.[7]  The Collection Policy is, in fact, ambiguous, because it expressly prohibits Metro from modifying or altering the terms of loans, yet refers to "extended" due dates in the very next paragraph.  The Court categorically rejects the notion that extending the due date for an interest payment does not constitute a "modification" of the loan.  "Modification" means "[a] change to something." Black's Law Dictionary 1025 (8th ed. 2004).  Extending the due date for an interest payment is changing the due date for that payment, and interest payment due dates are material terms of any loan contract.

Since the ambiguity resulting from the amendments to the Collection Policy must be interpreted against Metro, I conclude that the document prohibits the unilateral extension of interest due dates.  The reference to "extended" due dates, in the context of the WestLB transaction, must be read to refer to due dates that were extended in accordance with the Servicing Agreement—i.e., with WestLB's consent.

---

[7] This is in contrast to the Servicing Agreement. a contract between sophisticated parties, the drafting of which involved back and forth negotiation between those parties.

However, even if the Collection Policy is interpreted as permitting the extension of interest payments, it cannot be disputed that it only allows Metro to do so if Metro has "reasonably determine[d] that the loan and payments thereon remain collectible." (2/19 Hecht Decl. Ex. A at 11.) It appears that Metro, however, has unreasonably granted a number of extensions. based on nothing more than a hope and a prayer that the borrower might someday be able to pay.

In addition to the Waterfront loan discussed above, supra at Discussion II.B.3, Hecht also testified about a loan given to AOLS, Inc., secured by eight acres of land in New Jersey. (3110 Tr. 114:8-117:11.) AOLS last paid interest in May 2008. (Id. 114:22-24.) Initially, Metro granted AOLS a one-year extension, to May 2009, because AOLS had entered into a contract to sell the property — and selling the property would presumably enable AOLS to pay Metro. (ld. 115:3-4, 116:25-117:3.) A year later, despite the fact that the property still had not sold, Metro granted AOLS another extension, to November 2009. (Id. 115:5-7.) Incredibly, Hecht testified that he would have given AOLS yet *another* extension in November 2009—even though AOLS had not paid a dime of interest for a year and a half — if WestLB had not prevented him from doing so. (See id. 115:18-116:1.) Hecht admits that the prospective buyer — the same one who entered the contract of sale with AOLS in 2008 — is still "not able to get financing" to buy the property. (See id. 117:8-11.) Metro's servicing of the AOLS loan, like its servicing of the Waterfront loan, can hardly be described as reasonable or prudent — it is more of the "hoping and praying" variety of loan management.

### c.   Metro's Breach of Section 2.02(b) Qualifies as a Servicer Termination Event

Metro's breach of Section 2.02(b) qualifies as a Servicer Termination Event under Section 6.01(a)(i) of the Servicing Agreement.  Under Section 6.01(a)(i), a Servicer Termination Event has occurred if

> [Metro] fails to perform or observe any covenant or agreement of the Servicer under . . . any . . . Transaction Document and such failure continues unremedied for five (5) Business Days after the written notification thereof by [WestLB] to [Metro].

(2119 Hecht Decl. Ex. C at 31.)  As established above, Metro violated its affirmative covenant to obtain WestLB's written consent before modifying loans.  Nor did Metro attempt to remedy this failure within five days of the August 25 Notice, which alerted Metro that it had breached Section 2.02(b).  Metro did not, for example, attempt to accelerate payment of the deferred interest.  Nor did it seek WestLB's belated consent.  Instead, Metro responded that it was entitled to extend interest payments at its discretion, without WestLB's consent.  Thus, pursuant to Section 6.01(b), Metro's unilateral modification of loans gives WestLB another ground for terminating Metro as Servicer.

### 2.   Metro's Materially Misleading Reporting Constitutes a Breach of the Servicing Agreement

Metro has also breached the Servicing Agreement by violating the reporting requirements in Section 2.01(g).

In Section 2.01(g), Metro warranted that all written information it furnishes to WestLB in connection with the loan transaction is "true and accurate in every material respect . . . and does not and will not contain any material misstatement of fact or be otherwise misleading in light of the circumstances under which such information was furnished."  (2/19 Hecht Decl. Ex. C at 6.)

Section 4.01(a) of the Servicing Agreement requires Metro to provide WestLB with Monthly

Reports containing detailed information about the status of MFC's loans.  (See id. at 27.)

Metro's Monthly Reports to WestLB blatantly violated Section 2.01(g).  Metro admits

that it began extending interest payments as early as May 2008.  Yet for more than a year,

Metro's Monthly Reports to WestLB failed to disclose any of the deferrals.  Metro's August

2009 Report — its first report *after* WestLB's inquiry regarding the portfolio — shines a light on

Metro's omissions.  In the August 2009 Report, the Borrowing Base table contains an additional

column, not seen in any of Metro's previous Monthly Reports, that indicates loans on which

interest payments had been extended.  Whether or not Metro has the right to extend, it has an

affirmative obligation to make full disclosure and not to omit anything that would make its

Reports misleading.  It is relevant to the performance of a loan if the borrower is not currently

paying interest--even if that is pursuant to an extension.  There is no way Metro can leave out

the "extensions" and comply with its reporting obligations.

Metro claims that WestLB should have known about the extensions as a result of Valley

National's bank statements, which reported information regarding the amount of interest and

principal deposited into the Collection Account.  That is neither persuasive nor relevant.

Knowing that less money was coming in does not tell you that five borrowers had been granted

extensions, and so were not considered to be in default by Metro.  The relevant fact is this:

Metro's Monthly Reports were materially misleading, in violation of Section 2.01(g) of the

Servicing Agreement.  Metro's Reports not only failed to disclose the obviously material fact of

the extensions, but they also almost surely understated the Delinquency Ratio (and the three-

month rolling average of the Delinquency Ratio), as Metro was not calculating the Delinquency

Ratio in accordance with the terms of the contracts, see supra at Discussion II.B.

## C.   Metro Has Not Shown Any Likelihood That It Will Be Able to Prove a Contractual Right to the Reimbursements It Seeks

If WestLB has the right to terminate Metro as Servicer, Metro's request for a preliminary injunction compelling the release of funds from the Collection Account is moot.  However, that application also fails on the merits, because Metro has not shown that it is likely to succeed in proving that it has a contractual right to be reimbursed from the Collection Account for carrying costs.

Several provisions in the Servicing and Credit Agreements are relevant to whether Metro is contractually entitled to such reimbursement.  First and foremost, Section 3.07 of the Servicing Agreement entitles Metro "to payment of the Servicing Fee in accordance with, and subject to the priority of payments set forth in, Section 2.3 of the [Credit] Agreement," but also requires Metro "to pay all expenses incurred by it in connection with its activities hereunder . . . and *shall not be entitled to reimbursement therefor except as specifically provided herein."*  (2119 Hecht Decl. Ex. C at 23 (emphasis added).)

Nowhere in the Servicing Agreement is it "specifically provided" that Metro is entitled to reimbursement for the costs it denominates as "carrying costs."  Metro asserts that the word "expenses" in Section 3.07 refers only to Metro's "own fees"—such as payroll, rent and office expenses—and not to property maintenance expenses.  (See Metro Reply at 2; Hecht Reply Decl. ¶ 9.)

The Court sees nothing in the contract to support Metro.  In its first two sentences, Section 3.07 expressly entitles Metro to two types of payments: the Servicing Fee, and "fees received by it for consenting to a conveyance or entering into an assumption and modification agreement."  (See 2119 Hecht Decl. Ex. C at 23.)  Then, in its third and final sentence, Section 3.07 explains what Metro is *not* entitled to—reimbursement of "all expenses" incurred "in

connection with" its servicing activities, except as "specifically provided" in the Servicing

Agreement. (Id.) Metro does not argue, or even suggest, that it paid property carrying costs

otherwise than "in connection with" its duties as the Servicer of the loans relating to these

properties. Therefore. Section 3.07 explicitly forbids reimbursement unless some other provision

of the Servicing Agreement *specifically* provides for the reimbursement of that type of expense.

There is no such provision.

   Metro asserts that funds from the Collection Account "have historically been used to pay

carrying costs, a course of performance that Metro seeks to continue." (Metro Reply at 2.) Even

if this is true, the parties' course of performance is only relevant to contract interpretation where

the contractual language is ambiguous. See Conte v. U.S. Alliance Fed. Credit Union, 303 F.

Supp. 2d 220, 230 (D. Conn. 2004) ("While . . . prior course of dealings between parties is

relevant in determining the meaning of an ambiguous contract, it is clear that, in New York, a

course of dealing would not alter the express terms of a contract when, as here, the contract is not

ambiguous.") (citing cases). In this case Section 3.07 is not at all ambiguous.

   Thus, the mere fact that Metro wants to continue what has been, for Metro, a beneficial

course of dealing, does not mean that it has a contractual right to do so. Section 9.01(b) of the

Servicing Agreement expressly states that, "No provision of this Agreement may be amended,

supplemented, modified or waived except in a writing executed by all of the parties hereto."

(2119 Hecht Decl. Ex. C at 40.) Metro has submitted no evidence of any such writing altering

the terms of the Agreement.

   Furthermore, the Transaction Documents specify the account from which Metro can

obtain money to pay so-called "carrying costs"—and it is not the Collection Account. Sections

3.02, 3.07 and 3.15 of the Servicing Agreement contemplate that Metro will pay "taxes,

insurance premiums, assessments and similar items" from *Escrow Accounts* that are funded by payments collected from the Mortgagors.  (See id. at 18-19.)  Under Section 3.02(e) of the Servicing Agreement, "it is understood and agreed that [Metro] need not . . . deposit in the Collection Account . . . amounts received by [Metro] for the accounts of Mortgagors for application toward the payment of taxes, insurance premiums, assessments and similar items, which amounts shall be deposited into Escrow Accounts pursuant to Section 3.15 and utilized by [Metro] to pay [such expenses] when those amounts are due."  (Id.)

Section 3.15(a) provides. in turn. that Metro "shall establish and maintain one or more [Escrow Accounts] and promptly deposit and retain therein all collections from the Mortgagors (or advances by the Servicer) for the payment of taxes, assessments, hazard insurance premiums or comparable items for the account of the Mortgagors."  (Id. at 26.)  Under Section 3.15(c), Metro, not WestLB, "shall advance any payments referred to in Section 3.15(a) that are not timely paid by the Mortgagors on the date when . . . due, but [Metro] shall be required so to advance only to the extent that such advances, in the good faith judgment of [Metro], will be recoverable by [Metro] out of Insurance Proceeds, Liquidation Proceeds or otherwise."  (Id. at 27.)

Thus, Sections 3.02, 3.07 and 3.15 of the Servicing Agreement show that the Collection Account was not intended to be the source of funds for Metro's payment of carrying costs on the underlying properties.  If the Escrow Accounts are empty because the mortgagors are not paying interest, Metro must either not make the payments or make up the difference out of its own pocket—not out of the Collection Account.

    **1.**    **Metro Is Not Likely to Prevail on Its Contention That Its Payment of Carrying Costs Is a "Servicer Advance"**

Metro contends that it is entitled to reimbursement from the Collection Account because its payments of carrying costs qualify as Servicer Advances. The Credit Agreement defines Servicer Advances to mean, "with respect to a Mortgage Loan, subject to the terms and conditions applicable to the making of Servicer Advances as set forth in Section 1.1(d), the amount by which [Metro] may fund for the payment of interest and fees on Mortgage Loans on the related Settlement Date in connection with such Mortgage Loans." (2/19 Hecht Decl. Ex. B at Ex. 1.)[8] Pursuant to Section 2.3 of the Credit Agreement, which sets forth the order in which available funds will be disbursed from the Collection Account, Servicer Advances are to be repaid first, even ahead of Metro's Servicing Fee. (See id. Ex. B at 6.)

However. Section 1.1(d) of the Credit Agreement expressly provides that "in no event shall any Servicer Advance . . . be made if such Mortgage Loan shall be a *Defaulted* Mortgage Loan, or if all or a portion of such Servicer Advance is deemed non-recoverable by [Metro]." (Id. at 2-3 (emphasis added).) In his declaration, Metro's Hecht provides three examples of "loans that will require funding to preserve and maintain the collateral." (Id. ¶ 98.) Each of those loans, Hecht admits, is currently in default. (See id. ¶¶ 84-98.) In their brief in support of their application for a preliminary injunction, plaintiffs Satori and the Charitable Trust acknowledge as much. They characterize WestLB's alleged breach as "preventing Metro . . . from paying the fees and expenses necessary to maintain the *properties as to which the borrowers' payments have been delinquent or which are in foreclosure."* (Satori/Charitable Trust Mem. at 1 (emphasis added).) Therefore, at least some—if not almost all—of the

---

[8] "Settlement Date" refers to "the 12th day of each month, or if such day is not a Business Day, the next succeeding Business Day." (2119 Hecht Decl. Ex. B at Ex. 1.)

properties on which Metro wants to use the Collection Account to pay "fees and expenses" are securing defaulted loans, on which Servicer Advances cannot be made.

Moreover. although Section 2.3 of the Credit Agreement establishes that Servicer Advances are repaid before any other amounts are distributed from the Collection Account, it also provides that "any reimbursement of [Metro] for a Servicer Advance[] shall be limited to such amounts received by the Custodian during the related Settlement Period in respect of Servicer Advance Loans." (2/19 Hecht Decl. Ex. B at 6.)[9] A "Servicer Advance Loan" is a mortgage loan as to which a Servicer Advance has been made.  (See id. Ex. B at Ex. 1.)  Thus, Metro is only entitled to reimbursement of Servicer Advances out of the Collection Account for advances made in connection with performing loans.  As a result, even in the unlikely event that Metro's payments of carrying costs were deemed Servicer Advances, Metro probably still would not be entitled to reimbursement, because most if not all of the loans on which Metro has made (or wishes to make) such advances are not generating any income.  Metro. which bears the burden of proving its right to injunctive relief, offers no evidence to support any claim that the Servicer Advances for which it seeks reimbursement have been made for performing loans.

As if that were not enough, Sections 1.1(d) of the Credit Agreement and 2.02(q) of the Servicing Agreement, read together, strongly suggest that Metro's payments of maintenance and operation expenses on the underlying properties do not qualify as Servicer Advances under the terms of the Transaction Documents, even when made in connection with performing loans. Section 1.1(d) (which is explicitly referenced in the Credit Agreement's definition of "Servicer Advances") provides that, "If [WestLB] cannot make an Interest Advance" — defined as "an Advance solely for the payment of interest and fees owed to [WestLB] under the terms of [the

---

[9] The "Settlement Period" refers to the calendar month preceding the month in which the related Settlement Date occurs. (2l19 Hecht Decl. Ex. B at Ex. 1.)

Credit] Agreement"—then "[Metro], subject to the limitations set forth in the Servicing

Agreement, may make a Servicer Advance." (See id. Ex. B at 2.)

Under Section 2.02(q) of the Servicing Agreement (titled "Interest Reserves and Servicer

Advances"), Metro is required to make Servicer Advances from its own account

> in an amount necessary to ensure that all Scheduled Payments of
> interest then due and payable on the Mortgage Loans on such Due
> Date are fully paid thereon (but only to the extent that, in the good
> faith judgment of [Metro], such amount would be ultimately
> recoverable from Liquidation Proceeds, late payment fees.
> Prepayment Charges, Insurance Proceeds or any other future
> payments on the Mortgage Loan . . .), and [to] deposit such amount
> on such date into the Collection Account.

(Id. Ex. C at 13.)

It thus appears that Servicer Advances have nothing to do with the payment of carrying

costs. Instead, Servicer Advances are principally intended to cover shortfalls in *MFC's* cash

flow on a month-to-month basis. That is, the purpose of Servicer Advances is to ensure that

scheduled interest payments and related loan fees are paid in full each month and are deposited

in the Collection Account for the benefit of WestLB.

In arguing that payments of carrying costs do qualify as a Servicer Advance, Metro

points to Sections 3.15(a) and (c) of the Servicing Agreement, which provide that the Escrow

Accounts discussed above—used by Metro to pay "taxes, assessments, hazard insurance

premiums or comparable items"—will be comprised of "collections from the Mortgagors (or

advances by the Servicer)." (Id. Ex. C at 26 (Section 3.15(a)) (emphasis added).) It is important

to note that Section 3.15(c) does not use the defined term "Servicer Advances," which suggests

that the "advances" by the Servicer to which this Section refers are different from Servicer

Advances. Also, Metro omits critical language from Section 3.15(c) when it makes its argument

(see Metro Reply at 2): Metro is required to advance the payments referred to in Section 3.15(a)

"only to the extent that such advances, in the good faith judgment of [Metro], will be *recoverable by [Metro] out of Insurance Proceeds, Liquidation Proceeds or otherwise.*" (Id. at 27 (emphasis added).) The italicized language makes it crystal clear that the Collection Account is not the source from which Metro can recoup advances it makes for carrying costs.

In sum, WestLB has the better of the arguments here.  Metro has not shown that it is likely to succeed on its claim that it has a contractual right to the reimbursements it seeks.

### D.   Plaintiffs Have Failed to Show Sufficiently Serious Questions Going to the Merits of Their Claim for Impairment of Security

To prevail on a claim for impairment of security interest under New York law, a plaintiff must prove "(1) a wrongful act of the defendant; (2) impairment of security resulting from that act; and (3) the amount of such impairment." Pioneer Commercial Funding Corp. v. United Airlines, Inc., 122 B.R. 871, 886 (S.D.N.Y. 1991) (quoting Syracuse Sav. Bank v. Onondaga Silk Co., 26 N.Y.S.2d 448, 450 (Sup. Ct. 1940)).

Metro does not even claim that it *has* a security interest in the underlying collateral (the property that it seeks to maintain).  It admits that "Metro neither owns the properties nor does it have a secured interest in the properties." (Metro Reply at 2.)  Second, neither Satori nor the Charitable Trust is a party to the Transaction Documents; thus, to the extent they seek relief under the Servicing and Credit Agreements — for example, an injunction forcing WestLB to reimburse Metro for the cost of maintaining the collateral — they lack standing to do so.

Finally, with respect to the merits of the claim, it seems highly unlikely to succeed because Plaintiffs will be unable to prove a "wrongful act" by WestLB — as established above, Metro, not WestLB, appears to be the breaching party.

In sum, Plaintiffs have failed to show sufficiently serious questions going to the merits of the two claims that underlie their applications for preliminary injunctions.  The Court need not

reach the merits of Plaintiffs' other three claims, which do not provide grounds for emergency relief.  The Court also need not address the remaining prongs of the test for preliminary injunctive relief, as the Court has already found that Plaintiffs have failed to meet an essential element of their heavy burden.

## **CONCLUSION**

For the reasons set forth above. the Court denies Plaintiffs' applications for preliminary injunctive relief in their entirety.  The Court will not stay its decision pending appeal.  However, the Court will not lift the temporary restraining order until 2 p.m. on Tuesday, March 23,2010.  This will give Plaintiffs time to apply to the United States Court of Appeals for the Second Circuit for a stay pending appeal and to report back to this Court.

Dated: March 19, 2010

_____
U.S.D.J.

BY ECF TO ALL COUNSEL